# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| BRAD O'DELL,<br><br>　　　　Appellant,<br><br>v.<br><br>CAROLINA INTERNET, LTD.,<br><br>　　　　Appellee. | NO. 3:14-CV-190<br><br>**ORDER** |

**THIS MATTER** is before the Court upon Appellant Brad O'Dell's appeal of an April 18, 2014 order of the bankruptcy court enjoining a state court action initiated by O'Dell. That order enjoined O'Dell from maintaining an action to collect a debt against Appellee Carolina Internet, Ltd. for allegedly breaching a contract that was not provided for during Appellee's bankruptcy proceedings (Doc. No. 1-1, Bankr. Dkt. 636, hereinafter "Bankruptcy Order"). For the reasons set forth below, the Court finds no error and **AFFIRMS** the ruling of the bankruptcy court.

## I. STANDARD OF REVIEW

This Court has jurisdiction over "final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a). Courts in this circuit apply two standards of review for bankruptcy appeals: "The Bankruptcy Court's conclusions of law are reviewed *de novo* and its findings of fact are reviewed for clear error." *Campbell v. Hanover Ins. Co.*, 457 B.R. 452, 456 (W.D.N.C. 2011). "Typically, mixed questions of law and fact are also reviewed *de novo*." *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 686 (E.D.N.C. 2009); *see In re Litton*, 330 F.3d 636, 642 (4th Cir. 2003).

## II. BACKGROUND

Most of the relevant facts of this case are not in dispute. Appellee Carolina Internet filed a voluntary Chapter 11 case in this district on September 23, 2011. At the time of filing, Appellee had an agreement[1] with Appellant Brad O'Dell whereby Appellee was regularly paying him 6.5% of the revenue from its sales to a company called Data Conversions. O'Dell was neither an employee of Data Conversions nor Carolina Internet; however, O'Dell was a founder of Data Conversions and had been instrumental in securing the Data Conversions account for Carolina Internet. This account represented 60% of Appellee's revenues, and Appellee apparently believed that O'Dell could also take the account away. These payments ranged between $25,000 and $45,000 each month.

When Carolina Internet filed for bankruptcy on September 23, it failed to list O'Dell in the petition or matrix. Nor was O'Dell mentioned in Appellee's schedules and statements filed on October 6, 2011, in its cash collateral motions, at the initial hearings, or in the proposed operating budget. Significantly, Carolina Internet made no mention of O'Dell in Schedule G where a debtor is required to list its executory contracts. As a result, O'Dell did not receive formal notice of the bankruptcy filing or the case hearings.

The parties do not dispute, however, that O'Dell was fully aware of Carolina Internet's Chapter 11 filing. In the period leading up to the bankruptcy, O'Dell had weekly conversations with Mike White, the president of Carolina Internet, in which the bankruptcy and the circumstances precipitating it were discussed. In fact, O'Dell was present in meetings with

---

[1] The precise nature of this agreement is not clear from the record. The bankruptcy court characterized it as "an oral understanding," (Bankr. Order at 2), while Appellant avers that it is a written contract, (*see* Doc. No. 3 at 12, n.3). Appellant concedes that no written contract is part of the record in this case, and whether the agreement was oral or in writing is not germane for the purposes of this appeal.

Carolina Internet and Data Conversions on the day before and the day after the Chapter 11 filing. These meetings continued throughout the pendency of the case.

Despite failing to include O'Dell in its executory contracts, Appellee continued to pay O'Dell after filing for bankruptcy. In the budget submitted in conjunction with the cash collateral hearing, Carolina Internet included a $22,124.66 expense in October described as "Sales Commissions." When the creditors' committee discovered that this was a payment to O'Dell, and that O'Dell was not employed by Carolina Internet, it demanded by letter of December 6, 2011 that the payments cease and that Appellee take steps to recover the payments. Just days later, apparently fearing the loss of the Data Conversions account, Appellee moved to assume O'Dell's alleged executory contract. (Bankr. Dkt. 134). Appellee did not serve O'Dell with the motion; however, O'Dell was entirely aware of it. He even helped prepare it, drafting an attachment describing his alleged services to Carolina Internet for which he was to be compensated. The creditors' committee objected to the motion and even threatened to sue O'Dell to recover the sums previously paid. After several continuances of the hearing on the motion, "and with it increasingly clear that it was unlikely to succeed," (Bankr. Order at 4), Appellee abandoned the motion.[2] White kept O'Dell informed of the proceedings through e-mails, telephone conversations, and face-to-face meetings. The payments to O'Dell eventually ceased in June of 2012. (Bankr. Dkt. 656 at 31).

While these proceedings were taking place, O'Dell hired attorney Joe Ledford to represent him after he was subpoenaed by TW Telecom to testify in regard to another matter in

---

[2] (*See* Bankr. Order at 4-5). Appellant contends that because the motion was never formally withdrawn, his contract was not actually rejected by the plan of reorganization. For the reasons discussed *infra*, the Court finds this argument unpersuasive.

3

the bankruptcy case.[3] Ledford never entered a formal appearance in the case, but did speak to both debtor's counsel and counsel for the committee on several occasions on O'Dell's behalf. After it became clear that the motion to assume would not be approved, Ledford spoke with Richard Mitchell, counsel for Carolina Internet, and asked how else O'Dell might have his payments resumed. Mitchell suggested filing a proof of claim, but noted that O'Dell "would be submitting himself to bankruptcy court jurisdiction." (Bankr. Order at 5). O'Dell never filed a claim, and never filed any motion of his own to compel payment.

On April 23, 2012, Carolina Internet filed its first Plan and Disclosure Statement. In an attempt to win support for the plan, it proposed to withdraw the motion to assume and reject O'Dell's contract. Once again, O'Dell did not receive service of the plan, but he was made aware through his conversations with White that the plan did not provide for the assumption of his contract. (*See* Bankr. Order at 5). The creditors opposed the first plan, and over the next nine months, Appellee and its creditors negotiated the terms and conditions of a consensual plan. That plan—Appellee's Third Amended Plan (the "Plan")—was confirmed without opposition on December 12, 2012. That Plan depended on a $3.2 million loan by Scott Coffman, the principal of Data Conversions, which was used to fund the Plan and pay unsecured creditors. As a condition of the loan agreement, Appellee agreed that it would "not incur, create, assume or permit to exist any Indebtedness . . . except for indebtedness provided or allowed under the Plan . . . ." (Bankr. Order at 7). Similarly, the Plan provided that:

> Unless otherwise specified by an order of the Bankruptcy Court, any Proofs of Claims based on the rejection of the Debtor's Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with the Court no later than 30 days after the effective date of such rejection . . . .

---

[3] The bankruptcy court noted that this subpoena bore the caption of the bankruptcy case, as well as other pertinent court information. (Bankr. Order at 4).

4

(Bankr. Dkt. 524 at 3). Upon the Plan's confirmation on December 12, all executory contracts not expressly assumed were effectively rejected.[4] The Plan was consummated and Carolina Internet's debts were discharged pursuant to 11 U.S.C. § 1141(d)(1)(A). (*See* Bankr. Dkt. 585). The bankruptcy case was closed on March 11, 2013. (*See* Bankr. Dkt. 617).

At no point before or after Plan confirmation did O'Dell file a claim or otherwise request payments. As the bankruptcy court aptly noted, "O'Dell's passivity about losing $22,000 per month makes no rational sense." (Bankr. Order at 6). It is at least partially explained, however, by conversations that took place between O'Dell and White. Beginning in April 2012 with the filing of its first proposed plan, Carolina Internet began telling creditors that it would reject its arrangement with O'Dell. At the same time, White was telling O'Dell the opposite. White advised O'Dell of the creditor opposition to their arrangement, told him it was unlikely the motion to assume would succeed, and explained that the payments could not continue during the bankruptcy. White promised, however, that once Carolina Internet was out of bankruptcy, the payments could resume. It would be "business as usual." (Bankr. Dkt. 656 at 60). Here the bankruptcy court noted that "O'Dell was mollified, sat out the confirmation process, and waited for the case to be closed." (Bankr. Order at 6).

It apparently was not business as usual after Appellee was discharged from bankruptcy, as Appellee never resumed its payments to O'Dell. O'Dell filed a complaint in Superior Court in

---

[4] The Plan provides as follows:

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement, or document entered into in connection with the Plan, as of the Effective Date the Debtor shall be deemed to have rejected each Executory Contract or Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease (1) was previously assumed or rejected; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to assume filed on or before the Confirmation Date; or (4) is [designated] specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases.

(Bankr. Dkt. 524 at 2).

5

Mecklenburg County on October 22, 2013 seeking commissions allegedly owed to him under the previous payment arrangement. Upon motion from Appellee, the bankruptcy court reopened the bankruptcy case on November 4, 2013 (Bankr. Dkt. 620). Thereafter Appellee filed a motion (Bankr. Dkt. 623) seeking to enjoin the state court action and for sanctions for violating the discharge injunction. The bankruptcy court held several hearings on the matter before issuing its Order, which granted the injunction but denied sanctions against O'Dell (Bankr. Dkt. 636).

### III. DISCUSSION

Appellant presents the following issues for appeal:

1. Did the bankruptcy court err in ruling that the claim of O'Dell, a known creditor of Carolina Internet, is discharged for failure to file a claim when Carolina Internet never provided formal written notice of a bankruptcy proceeding, including, but not limited to, the claims bar date?
2. Did the bankruptcy court err in ruling that due process does not require that O'Dell receive formal written notice of the bankruptcy proceedings, including, but not limited to, the claims bar date, before O'Dell's claim can be discharged for failure to file a claim?
3. Did the bankruptcy court err in ruling that due process does not require that O'Dell receive formal written notice of Carolina Internet's approved plan of reorganization detailing the treatment of O'Dell's claim?
4. Did the bankruptcy court err in ruling that O'Dell received due process such that his claim is barred?
5. Did the bankruptcy court err in finding that O'Dell was made aware of the treatment of his claim in Appellee's approved plan of reorganization?
6. Did the bankruptcy court err in ruling that O'Dell was constitutionally afforded an opportunity to present objections to the treatment of his claim under Appellee's plan of reorganization?
7. Did the bankruptcy court err in ruling that Appellee's approved plan of reorganization rejected O'Dell's executory contract when the contract was the subject of a filed motion to assume which had not been withdrawn prior to confirmation and the plan provides that such contracts are not rejected?

(*See* Doc. No. 3 at 6-7). With the exception of issue five, these are mixed questions of law and fact which the Court will review *de novo*. Issue five is a question of fact which this Court reviews for clear error. Taken as a whole, issues one through six boil down thus: Did O'Dell

receive sufficient notice of the bankruptcy proceedings such that the requirements of due process were satisfied? For the reasons stated below, the Court finds that he did.

**A. Bankruptcy Order**

As an initial matter, the bankruptcy court found that Carolina Internet's confirmed plan discharged O'Dell's claim pursuant to 11 U.S.C. § 1141(d)(1). A confirmed plan has a res judicata effect which precludes parties from raising claims that could have or should have been raised before confirmation but were not. *See In re Varet Enters., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). Pursuant to § 1141(d)(1), any debt which arose prior to the date of confirmation is discharged, regardless of whether a proof of claim was filed. The bankruptcy court found that O'Dell's claim, whether construed as a contractual right to payment or as a gratuity, was indisputably a pre-petition debt. The fact that Carolina Internet and O'Dell appeared to have a "side deal" to resume payments after bankruptcy does not change this fact, because a debtor must follow the procedures set forth in 11 U.S.C. § 1141(d)(4) if it would like to waive discharge as to a particular creditor. The bankruptcy court found that those requirements were unmet in this case; thus, O'Dell's claim was discharged even though he did not file a proof of claim.

The bulk of the bankruptcy court's order discusses whether O'Dell received adequate notice of the bankruptcy proceedings such that the requirements of due process were met. That court noted that due process requires "known creditors" of a bankruptcy estate to receive actual, as opposed to constructive, notice of the debtor's bankruptcy filing and the applicable claims bar date. It acknowledged that O'Dell was a known creditor of Carolina Internet, that he did not receive formal written notice of the bankruptcy proceedings, and that this was done purposefully. However, the bankruptcy court also noted that notice only needs to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of an action and afford

7

them the opportunity to present their objections." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); (*see* Bankr. Order at 15). With that standard in mind, the bankruptcy court found that the requirements of due process had been met:

> Here we have a putative creditor who did not receive formal notice of the bankruptcy filing or plan, but was active in the case behind the scenes and acting in consort with the debtor to subvert the bankruptcy process . . . . He was fully aware of the intimate details of the bankruptcy . . . and then stood mute in hopes that his claim could survive the bankruptcy process. He was on the inside of the reorganization, not the outside. The side deal O'Dell had with the Debtor was an attempt to accomplish by secret agreement [what] they could not get done overtly in the bankruptcy case: pay a dubious claim in full, at the expense of the other parties to the case.

(Bankr. Order at 16). The court concluded that O'Dell's side deal with Carolina Internet was "a fraud on this court" and that the Due Process Clause of the Fifth Amendment "was never intended to be a tool to a fraud." (*Id.* at 18). The court further found that, through his dealings with Carolina Internet, O'Dell had actual notice of the case and that he was bound by its outcome.

### B. Due Process

The Fifth Amendment guarantees that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Supreme Court long ago held that "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). Thus, a "fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). In *Mullane*, the Court further instructed that:

> The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met[,] the constitutional requirements are satisfied.

*Id.* at 314-15 (citations omitted).

In the bankruptcy context, "a claim asserted by a creditor against a debtor's estate cannot constitutionally be discharged . . . unless the debtor provides constitutionally adequate notice to the creditor of the debtor's bankruptcy proceeding, as well as the applicable filing deadlines and hearing dates." *In re J.A. Jones, Inc.*, 492 F.3d 242, 249 (4th Cir. 2007); *see also Bosiger v. U.S. Airways*, 510 F.3d 442, 451 (4th Cir. 2007) ("[P]re-existing debt can be discharged through bankruptcy only if the creditor was on notice of a debtor's bankruptcy filing and the claims bar date."). The type of notice required is interpreted flexibly, "measuring the adequacy of notice against the certainty of a creditor's claims." *Bosiger*, 510 F.3d at 447. Generally, a "known creditor" of a bankruptcy estate is entitled to actual, as opposed to constructive, notice. *In re J.A. Jones*, 492 F.3d at 249. Known creditors are those "whose identities are actually known to the debtor, as well as claimants whose identities are 'reasonably ascertainable' to the debtor." *Id.* at 250 (quoting *Tulsa Professional Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988)).

Appellant argues that he was entitled to formal, written notice of the bankruptcy proceedings, including the claims bar date and the approved Plan of reorganization. In support, he cites a number of cases holding that known creditors are entitled to actual notice, and *Bosiger v. U.S. Airways* for the proposition that that notice must be in writing. O'Dell notes that the bankruptcy court determined that he was a known creditor of Carolina Internet, and that there is no dispute that he did not receive formal written notice of the bankruptcy; thus, discharge of his claim constitutes a violation of due process. It is true that *Bosiger* held that "if the 'name,

interest, and address' of a creditor is known, actual written notice is required." 510 F.3d at 451 (quoting *City of New York v. N.Y., New Haven, & Hartford R.R. Co.*, 344 U.S. 293, 296 (1953)). In that case, the Fourth Circuit determined that the plaintiff's receipt of two separate letters notifying him about the defendant's bankruptcy and relevant dates constituted adequate notice. *See id.* at 451-52 ("Bosiger clearly received notice sufficient to meet the requirements of *Mullane* given the circumstances of his case.").

But this case is different. O'Dell did not require formal written notice of the bankruptcy proceedings because he already knew about them. The record in this case shows that he regularly discussed his potential claim with the debtor and then actively worked with the debtor to have his claim provided for in the bankruptcy. When those efforts were not successful, he willfully sat on his hands and waited for the case to be over. In short, he was entirely aware of and involved in the proceedings and made a deliberate choice not to file a claim. He did so in the hopes of evading the bankruptcy process and the reach of the bankruptcy court.

O'Dell does not dispute that he was fully aware of the bankruptcy case; rather, he argues that his claim was not discharged because he did not receive *written* notice of it. The result O'Dell desires would reduce the notice requirements of due process to a mere technicality. The cases to which O'Dell cites considered creditors who might not be given a full and fair opportunity to have their claims heard. They did not have in mind a creditor who has actual notice of a bankruptcy case and then attempts to defraud the bankruptcy court and other creditors by not filing a claim. The bankruptcy court found that O'Dell did just that and, based on a thorough review of the record in this case, this Court agrees. O'Dell maneuvered behind the scenes, using his relationship with Carolina Internet and its largest client in an attempt to gain an unfair advantage over other creditors. He worked with Carolina Internet to have his payments

assumed in an attempt to ratify what the bankruptcy court characterized as "a dubious claim," (Bankr. Order at 17). When that was unsuccessful, he struck a side deal with Mike White to circumvent the bankruptcy process and have his payments resumed anyway. O'Dell did not miss the claims bar deadline or overlook the pendency of the bankruptcy for lack of notice; rather, he knew about and actively worked to subvert the bankruptcy process. He may not now claim the protections of due process because his scheme ultimately failed.

O'Dell disputes the bankruptcy court's finding that he knew his contract was not provided for in the Plan, and further disputes that he was complicit in any attempt to subvert the bankruptcy proceedings. (*See* Doc. No. 3 at 22 ("Under the circumstances, O'Dell believed the hiatus in payments was just the cut back he would have to take to help Carolina Internet reorganize.")). The Court finds that these contentions are inconsistent with the record in this case. Notably, the record reflects, and the bankruptcy court found, that O'Dell retained an attorney who advised him on the bankruptcy proceedings and spoke with other counsel in the case specifically about O'Dell's payments. In one of those conversations, counsel for Carolina Internet suggested that O'Dell could file a claim in the case, but noted that he "was going to submit himself . . . to the jurisdiction of the Court." (Bankr. Dkt. 656 at 51; *see* Bankr. Order at 5). Based on these facts, it is highly improbable that O'Dell thought the hiatus in his payments was just part of the bankruptcy process.

Moreover, the bankruptcy court specifically found that O'Dell knew his claim was not being provided for and was "acting in consort with the debtor to subvert the bankruptcy process." (Bankr. Order at 16; *see id.* at 18 ("While O'Dell was not formally served [with] the plan, he was more than aware that his claim was not provided for and he stood by and did nothing.")).[5] These

---

[5] O'Dell argues that, because Carolina Internet was actually lying to O'Dell about the resumption of his payments, the two could not have been "acting in consort." (*See* Doc. No. 3 at 23). Clearly, the parties had different

are findings of fact which this Court reviews for clear error. The Court finds that there is more than adequate evidence in the record to support the bankruptcy court's findings and that they are not clearly erroneous. Thus, under these "unique and unsavory" circumstances, (Bankr. Order at 16), and "with due regard for the practicalities and peculiarities" of this case, *Mullane*, 339 U.S. at 315, the Court finds that O'Dell's actual notice of the bankruptcy proceedings satisfies the notice requirements of due process in this case.

### C. Applicability of the Plan to O'Dell's Claim

In his last issue for appeal, O'Dell contends that his claim was not discharged by the Third Amended Plan because the motion to assume his contract was never formally withdrawn. The Plan provides, in pertinent part:

> . . . as of the Effective Date the Debtor shall be deemed to have rejected each Executory Contract or Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease . . . (3) is the subject of a motion or notice to assume filed on or before the Confirmation Date . . . .

(Bankr. Dkt. 524 at 2). Appellant notes that his agreement was in fact the subject of a motion to assume, and that the motion was filed on December 14, 2011, well before the Plan was confirmed on December 12, 2012. He further asserts that the motion was never formally withdrawn; ergo his claim was not actually rejected by the Plan.

When construing a plan of reorganization, courts apply contract principles. *See In re Shenango Grp., Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) (citing *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993); *In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1981)).

---

expectations about their arrangement, but this does not mean that O'Dell did not intentionally work to subvert the bankruptcy process. It certainly does not mean that he did not have actual notice of the proceedings sufficient to satisfy due process. The bankruptcy court aptly lamented that Carolina Internet would prevail in this matter, but this Court agrees that any other result would unwind the finality of the bankruptcy and complete O'Dell's attempted fraud against the other participants. (*See* Bankr. Order at 18).

The portion of the Plan that O'Dell cites, by its own terms, clearly contemplates motions to assume which were being actively considered at the time of confirmation, or which would be considered shortly thereafter. The other categories of exceptions deal with contracts which were previously assumed or rejected, expired by their own terms, or were listed in the schedule of assumed contracts. (*See* Bankr. Dkt. 524 at 2). Taken in context, this section of the Plan (titled "Rejection of Executory Contracts and Unexpired Leases"), constitutes a broad rejection of contracts and leases, except for those which had already been assumed during the bankruptcy proceedings and those which would be considered for such treatment in short order. O'Dell's contract falls in none of these categories because the motion to assume had been abandoned by Carolina Internet. (*See* Bankr. Order at 5). O'Dell essentially argues that the language of this section created a loophole for contracts which were at one time the subject of a motion to assume that was never formally ruled upon or withdrawn. Such contracts, then, would be in the unique position of surviving the bankruptcy despite never actually being assumed. The Court finds that this construction is wholly contrary to the terms and goals of the Plan, as well as the broad rehabilitative goals of Chapter 11.

While it appears that the motion to assume O'Dell's contract was never formally withdrawn, it is abundantly clear that both the parties and the court understood the motion to be abandoned and O'Dell's contract to be rejected.[6] Carolina Internet's agreement with O'Dell was the subject of intense negotiation during the bankruptcy proceedings. Had the parties meant for O'Dell's contract to survive the bankruptcy, it would have been clearly provided for in the Plan.

---

[6] *See* Bankr. Order at 5 ("Carolina Internet abandoned the Motion to Assume."); Bankr. Dkt. 656 at 47-48 (testimony of Richard Mitchell, counsel for Carolina Internet, explaining that the motion was not successful and that none of the plans assumed O'Dell's contract); Bankr. Dkt. 651 at 21 (bankruptcy court explaining that "[t]he last hearing on the motion to assume or reject was continued off docket at the part[ies]' request and was never heard again . . . . it was tabled because Mr. O'Dell and the debtors realized that it was not likely to be successful."); *Id.* at 25 ("[T]his plan didn't provide for his claim.").

It was not, and the provision he cites does not except his agreement from the broad rejection of contracts in section II.A. The bankruptcy court, then, did not err in finding that O'Dell's contract was rejected by the Plan.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Order of the Bankruptcy Court is **AFFIRMED** and this appeal is hereby **DISMISSED**. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Signed: January 8, 2015

Graham C. Mullen
United States District Judge